**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **CONSTANCE HAMPTON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 12 C 9300** |
| **v.** | ) | |
| | ) | **Magistrate Judge Daniel G. Martin** |
| **CAROLYN W. COLVIN,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Constance Hampton ("Plaintiff" or "Hampton" ) seeks judicial review of the final decision of the Commissioner of Social Security denying her application for disability insurance benefits and supplemental security income. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Hampton filed a Motion for Summary Judgment that seeks to reverse the Commissioner's decision. The Commissioner filed a cross-motion. For the reasons stated below, Plaintiff's motion is granted, and the Commissioner's motion is denied.

### I. Legal Standard

#### A. The Social Security Administration Standard

In order to qualify for disability benefits, a claimant must demonstrate that he is disabled. An individual does so by showing that he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for

a continuous period of not less than 12 months."  42 U.S.C. § 4243(d)(1)(A).  Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized."  20 C.F.R. § 404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims.  *See* 20 C.F.R. § 404.1520.  The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability.  20 C.F.R. § 404.1520(a)(4)(i).  It then determines at Step 2 whether the claimant's physical or mental impairment is severe and meets the twelve-month durational requirement noted above.  20 C.F.R. § 404.1520(a)(4)(ii).  At Step 3, the SSA compares the impairment (or combination of impairments) found at Step 2 to a list of impairments identified in the regulations ("the Listings").  The specific criteria that must be met to satisfy a Listing are described in Appendix 1 of the regulations.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1.  If the claimant's impairments meet or "medically equal" a Listing, the individual is considered to be disabled, and the analysis concludes; if a Listing is not met, the analysis proceeds to Step 4.  20 C.F.R. § 404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), which defines his exertional and non-exertional ability to work.  The SSA then determines at the fourth step whether the claimant is able to engage in any of his past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  If the claimant can do so, he is not disabled.  *Id.*  If the claimant cannot undertake past work, the SSA proceeds to Step 5 to determine whether a substantial number of jobs exist that the claimant can perform in light of his RFC, age, education, and work experience.  An individual is not disabled if

he can do work that is available under this standard. 20 C.F.R. § 404.1520(a)(4)(v).

**B. Standard of Review**

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413 (citation omitted).

## II. <u>Background Facts</u>

**A. Medical History**

Plaintiff's records present a complex picture of multiple disorders, including substance abuse, gastroparesis, depression, hypothyroidism, Type II diabetes,

hypertension, back pain, urine retention, foot pain, chronic constipation, and hepatis C. The extent of these disorders is reflected by Hampton's medications. These included over time methadone, Glucotrol, Humulin, enalapril, trazodone, levothyroxine, folic acid, naprosyn, thiamine, benzocaine, paroxetine (Paxil), Wellbutrin, Cymbalta, interferon, setraline (Zoloft), metformin, copegus (Ribavirin), and clotrimazole. (R. 287, 1014-20).

Notwithstanding, the records for each of Plaintiff's medical problems are limited. In October 2007, Hampton's mental status was assessed by a psychiatrist whose name is not legible from the record. The doctor determined that Plaintiff's thought processes were unremarkable and showed no signs of a psychosis. The doctor diagnosed her with polysubstance dependance and a depressive order NOS (not otherwise specified). She was advised to attend meetings of Narcotics Anonymous, as well as individual and group therapy. (R. 338). Hampton met with the psychiatrist throughout 2007, 2008, and 2009. The treatment notes show that she was treated with Cymbalta and Wellbutrin, with varying results. At times, her symptoms improved; at other times, they remained difficult.

Hampton also experienced sleep and energy problems during this period. (R. 344-52). The psychiatric progress notes indicate that on occasion Hampton was so fatigued that she fell asleep in the waiting area. Insomnia became such a problem that her psychiatrist considered prescribing Seroquel to help Hampton sleep more than two hours a night. As treatment progressed, however, the notes reflect that Plaintiff began sleeping better. By May 2009, Hampton was "sleeping OK" and was "smiling" and "brighter." (R. 353). The last note of June 2009 states that her depression had improved. (R. 354).

Most of the remaining records related to depression show that Hampton was treated

by nurse practitioners and social workers. By March 2010, Hampton was being treated with setraline for depression and trazadone for sleep. (R. 562). Complaints of depression and fatigue varied significantly. Hampton denied fatigue in January 2010, but experienced it in April 2010. (R. 558, 580). She complained of depression a year later in April 2011, but had denied it only a month earlier, and again in February 2011. (R. 952, 992, 1000).

Relatively few medical records relate to Hampton's treatment for diabetes, though treatment notes document changes in her medication and treatment regimen. In October 2009, however, Plaintiff began interferon treatment for hepatitis C. (R. 363). Hampton initially denied that she was experiencing any fatigue or pain. As the ALJ noted, however, subsequent complaints of fatigue came and went over time. Plaintiff had also denied having limiting pain earlier in January 2008, and stated later in February 2010 that she was not fatigued. (R. 479, 574). By March 2010, however, Plaintiff complained that interferon was giving rise to feelings of tiredness and depression. (R. 565). In June 2010, Hampton was diagnosed with hypothyroidism and mild anemia. Both were treated, and she was free from fatigue in September. (R. 898). Hampton also disclaimed fatigue in February and March 2011, but stated again in May 2011 that she was tired. (R. 952, 1000. 1033).

### B.    Hearing Testimony

#### 1.    <u>Plaintiff</u>

Plaintiff appeared at a hearing before the ALJ on June 21, 2011. Hampton described herself as five feet and three inches tall and weighing 200 pounds. She testified that she was unable to work because of pain in her back, legs, feet, and stomach. The pain in her feet stemmed from swelling that prevents her from walking more than three

blocks at a time. (R. 74). She experiences numbness in her feet and also has bunions. (R. 69). Nevertheless, Hampton had walked a mile within the last month, though she was required to stop every five steps. (R. 63). Prior foot surgery required Hampton to take pain medication that led to an addiction to prescription pain pills. She currently takes methadone to remain off of opioid medications like Vicodin.

As for her stomach pain, Hampton stated that it was caused by chronic constipation, which she elaborated on in some detail. Plaintiff is able to have bowel movements only once every four to six days. She also experiences problems with urination. (R. 72-73). Her problems are so severe that Hampton stated it rendered her unable to stand at times and caused her to see things "popping out" of her legs. (R. 64, 77).

Plaintiff also suffers from hepatitis C. Hampton stated that she was being treated with interferon but felt worse from the side effects. In particular, she feels fatigued and is too tired to do housework or to wash clothes. (R. 61-62). Her memory is poor, and she often forgets where she has put things. Plaintiff does not sweep or mop, though she sometimes washes dishes while sitting on a stool. Hampton often wears the same clothes for days at a time due to her fatigue. Plaintiff stated that she feels tired upon awakening in the morning and often sleeps during the day. She awakens every hour during the night. A diabetic, Hampton experiences high and low blood sugar spikes three times a week. (R. 65). Her vision is blurred, and she often sees double. Plaintiff stated that her problems led her to be depressed, and she sees a therapist when she needs additional help. (R. 55-56).

**2.  Dr. Sheldon Slodki**

Medical expert Dr. Sheldon Slodki also testified at the hearing.  After describing Plaintiff's disorders at length, Dr. Slodki stated that he agreed with the physical RFC provided by Dr. Virgilio Pilapil.  The terms of that RFC are discussed more fully below.  Dr. Slodki believed that Plaintiff had only a minimal amount of postural limitations.  The primary ones that applied included no use of ladders, ropes, and scaffolds, and only an occasional requirement for balancing or climbing stairs.  Dr. Slodki further noted that there was no evidence that Plaintiff currently used Vicodin or any drugs that were not prescribed to her by a physician.  (R. 79-84).

**C.   Medical and State Agency Physician Reports**

**1.   Dr. Roopa Karri**

On January 4, 2010, Plaintiff underwent a consultative examination with Dr. Roopa Karri.  Hampton had begun treatment with interferon and Ribavirin only one month earlier and stated that she felt "very fatigued."   (R. 490).   Dr. Karri noted that Hampton experienced difficulty with her "tandem gait" but did not require any assistive device to walk.  Her grip strength was normal, as was her range of motion with all of her limbs and spine.  Diffuse swelling was present in both hands, but Hampton did not experience any tenderness in her joints.   Dr. Karri concluded that Hampton's impairments included diabetes that was poorly controlled, a history of peripheral neuropathy, controlled hypertension, hepatitis C, and a history of depression.  (R. 489-92).

**2.   Dr. Joan Hakimi**

Dr. Joan Hakimi also conducted a psychological examination of Hampton. Dr.

Hakimi noted that the deaths of Hampton's parents had placed significant stress on her. Living with her husband's mentally impaired son was also difficult. Hampton told Dr. Hakimi that after she got her stepson ready for school, she often went back to bed and slept for much of the day. Plaintiff admitted that she was recovering from both alcohol and drug abuse and that she had been sober for over 10 years. Hampton was able to do the laundry and undertake minimal cooking involving pasta, cereal, and sandwiches. She did require assistance with showering or bathing, though she only took a shower twice a week.

Dr. Hakimi concluded that Plaintiff suffered from a depressive disorder secondary to a general medical condition. However, she also found that Hampton was a "fairly high functioning woman," with good cognitive functioning and some impairments in her judgment and problem-solving abilities.

### 3.    Dr. Carole Rosanova

On February 16, 2010, Dr. Carole Rosanova issued a Psychiatric Review Technique ("PRT") assessment on Plaintiff. Dr. Rosanova determined that Hampton suffered from affective disorders and a substance abuse disorder. The affective issue involved a "depressive dis[order] nos [not otherwise specified], bereavement." (R. 501). Dr. Rosanova issued a mental assessment that concluded that Plaintiff suffered from mild limitations in her activities of daily living and social functioning, and a moderate limitation in her ability to maintain concentration, persistence, or pace. One to two episodes of decompensation were also noted. Based on these findings and her review of the record, Dr. Rosanova issued a detailed mental RFC. She concluded that Plaintiff had only moderate restrictions, or in most cases no significant limitations, in all RFC areas.

According to Dr. Rosanova, Hampton was able to sustain simple, repetitive tasks that did not require her to carry out detailed instructions. Plaintiff was further limited to "routine stress and change." (R. 498-514).

### 4.     Dr. Virgilio Pilapil

Dr. Virgilio Pilapil issued a physical RFC on February 24, 2010. He found that Plaintiff could lift 10 pounds frequently, and up to 20 pounds occasionally. She could stand, walk, and sit for a total of six hours in an eight-hour workday. In making these assessments, Dr. Pilapil noted that Plaintiff neuropathy gave rise to "sensations" in both of her feet. He also noted that she had swelling in her hands. Dr. Pilapil further limited Plaintiff to only occasional climbing of stairs, occasional stooping, and no balancing. Importantly, however, Dr. Pilapil stated that Hampton's ability to perform work at this level would be begin on by October 27, 2010, not when he issued the RFC on February 24, 2010. (R. 523).

### 5.     Nurse Practitioners

Nurse practitioner Diane Judge issued a medical report for Plaintiff on April 9, 2010. For reasons that are unclear, the report is also signed by Marcia Katz, M.D. Ms. Judge set out a number of Plaintiff's chronic medical conditions, including diabetes, hepatitis C, hydronephrosis, depression, and pain and bloating in her stomach. She also stated that Plaintiff had experienced significant amounts of pain and fatigue. Ms. Judge concluded that the combination of these impairments significantly impaired Plaintiff's ability to work and would keep her from obtaining gainful employment. (R. 613).

Nurse practitioner Rachel Breivald also signed a medical report on March 25, 2010.

She stated that Plaintiff had been under her "psychiatric care" since November 2009. Breivald described Plaintiff's symptoms and concluded that Hampton experienced marked limitations in her concentration and pace, as well as in her occupational and social functioning. (R. 614).

Nurse practitioner Mary Tornabene issued a short report on June 9, 2011. It listed Hampton's disorders and noted that she had been a client in Tornabene's "medical home" for four years. Tornabene stated that Hampton could carry out basic activities of daily living. However, she believed that Plaintiff had a high risk for progression in her diabetes, hepatitis, depression, and hypertension without medical assistance. (R. 1042).

### D.    The ALJ's Decision

On July 15, 2011, ALJ Robert Asbille issued a written decision that found Hampton was not disabled. The ALJ determined at Step 1 that Hampton had not engaged in substantial gainful activity since her alleged onset date of May 1, 2005. He found her severe impairments at Step 2 to be diabetes with a history of peripheral neuropathy, hepatitis C, hypertension, level I obesity, anemia, hydronephrosis (a swelling of the kidneys), hypothyroidism, constipation, depression, anxiety, and a history of polysubstance abuse. None of these impairments were found at Step 3 to meet or medically equal one of the Listings. The ALJ conducted the "special technique" to assess mental impairments at Step 3 and found that Hampton had a mild restriction in her activities of daily living and moderate limitations in her social functioning and concentration. One to two episodes of decompensation were also found.

Before moving to Step 4, the ALJ found that Hampton's testimony was not entirely

credible. He assessed her RFC as light work with only occasional postural movements. Certain non-exertional limitations were also found. These included only simple instructions, occasional contact with supervisors, coworkers, and the general public. Based on these findings, the ALJ determined at Step 4 that Hampton could not perform her past relevant work. The ALJ heard testimony from the VE at Step 5 and concluded that Plaintiff was not disabled because a significant number of jobs existed that she could perform.

### III. Discussion

Plaintiff challenges the ALJ's decision on three grounds. According to Hampton, the ALJ: (1) improperly weighed the opinion evidence of the nurse practitioners, (2) incorrectly assessed Hampton's credibility, and (3) incorrectly determined her RFC. The Court addresses each of these concerns in turn.

### A. The Medical Source Issue

The ALJ gave little weight to opinions issued by nurse practitioners Mary Tornabene, Diane Judge, and Rachel Breivald. Hampton argues that the ALJ failed to consider the factors required for weighing medical opinions and that he mistakenly concluded that the nurse practitioners had given opinions on issues reserved to the Commissioner. She also points out that Judge's report was signed by Dr. Marcia Katz, making it more than a statement of a non-acceptable medical source.

An ALJ is required to evaluate every medical opinion in the record. 20 C.F.R. § 404.1527(d). *See Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) ("Weighing conflicting evidence from medical experts . . . is exactly what the ALJ is required to do.").

The regulations lay out six factors an ALJ should consider as part of this analysis, including the nature and length of the treatment relationship, the medical expert's specialization, and the degree to which a source's opinion is supported by other evidence. 20 C.F.R. § 404.1527(d)(1)-(6). The ALJ must clearly state the weight he has given to the medical sources and the reasons that support the decision. *See Ridinger v. Astrue*, 589 F. Supp.2d 995, 1006 (N.D. Ill. 2008). "A treating physician's opinion is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010).

Instead of addressing these factors, the Commissioner defends the ALJ's assessment of the nurses by noting that the ALJ gave "considerable" weight to the opinion of the state-agency physician, Dr. Pilapil. Unfortunately, that does not address Plaintiff's argument. "The proper frame for analysis is as follows: (1) did the ALJ commit error by not explaining the weight given to [a nurse's] opinion as an 'other source,' and (2) if so, was that error harmless?" *Compton v. Colvin*, 2013 WL 870606, at *10 (N.D. Ill. March 7, 2013). The Commissioner cannot claim that the ALJ was justified in favoring Dr. Pilapil over the nurses without first showing that he properly addressed the first prong of this standard concerning the nurses' opinions.[1]

Substantial evidence does not support the ALJ's conclusion on the nurse reports. Social Security Ruling 06-3p classifies nurses as "other sources" who are not "acceptable

---

[1] The Court does not address the harmless error issue because the Commissioner has not raised it in relation to the nurses' reports.

medical sources" such as physicians. The ALJ believed this justified his assessment, stating that little weight was assigned to the nurses "insofar as these are not acceptable medical sources." That was an incorrect statement of the law. "Other source" opinions "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." SSR 06-3p; *see also* 20 C.F.R. § 404.1513(d)(1). They must also be weighed using the same factors that apply to treating and acceptable sources. SSR 06-3p. The fact that the nurse practitioners are other sources says nothing in itself as to why they are only entitled to little weight. Social Security Ruling 06-3p stresses that an ALJ should "consider all of the available evidence in the individual's case record," including sources such as nurses. *Id*.

An ALJ's failure to evaluate a nurse practitioner's opinion in accordance with these guidelines can amount to reversible error. *Dogan v. Astrue*, 751 F. Supp.2d 1029, 1038-41 (N.D. Ind. 2010). That is because a nurse practitioner's report can be given "great" weight, and can even outweigh the opinion of an acceptable medical source like Dr. Pilapil. SSR 06-3p ("[D]epending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source,' including the medical opinion of a treating source."). As SSR 06-3p recognizes, the growing importance of managed care means that nurse practitioners play an increasingly large role in treating patients who would otherwise be seen by physicians or other acceptable medical sources.

The role played by nurse practitioners took on special significance in this case because they provided a very large proportion of Hampton's care. The reports made this

fact clear by stating the length of time each nurse had treated Plaintiff: four years for

Tornabene, three years for Judge, and five months for Breivald. Moreover, the nurses had

direct, and often detailed, knowledge of Hampton's test results, medications, and physical

and mental functioning. In many instances, the nurses themselves ordered Hampton's

tests and managed her medications for long periods of time. The ALJ was required to

consider these important facts in weighing their reports.

The ALJ discounted the nurses' reports, in part, because he believed they touched

on issues reserved to the Commissioner. Such issues ordinarily involve opinions on

whether a claimant is disabled and is unable to work. 20 C.F.R. § 404.1527(e). Nurses

Judge and Tornabene did state that Hampton's mental impairments restricted her ability

to work. (R. 613, 1042). For the most part, however, the nurses' opinions discuss

limitations in functional areas such as concentration and social functioning, or describe

specific symptoms that Hampton suffers from her medical conditions. These are not

issues reserved to the Commissioner. As the Seventh Circuit has noted, simply stating

that an issue is reserved to the Commissioner is "imprecise" and is "not the same as

stating that such a statement is improper and therefore to be ignored[.]" *Bjornson v.

Astrue*, 671 F.3d 640, 647 (7th Cir. 2012). The purpose of considering non-acceptable

medical sources is to give an ALJ additional insight "into the severity of the impairment(s)

and how it affects the individual's ability to function." SSR 06-03p.

The ALJ singled out Nurse Tornabene's report for criticism by comparing it with a

progress note that was issued on March 5, 2010, several months before Tornabene's June

2010 report. (R. 41, 565). The ALJ found that the progress note did not support the

extent of the limitations described in the later report. No explanation or reasoning was provided. This fails to build a logical bridge between the record and the ALJ's conclusion on this issue. It also fails to say anything about why Nurse Judge's and Nurse Breivald's opinions were given only little weight.

The ALJ's only remaining basis of criticism was that the nurses appeared to have relied heavily on Hampton's subjective complaints. An ALJ is free to discount a medical source opinion when it is "based *solely* on the patient's subjective complaints." *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) (emphasis added). *See also Bates v. Colvin*, — F.3d —, 2013 WL 6228317, at * 6 (7th Cir. Dec. 2, 2013). As before, the ALJ gave no explanation of how he reached this inference. Nurse Judge's report was clearly based on more than Hampton's subjective complaints. Judge cited specific diagnoses, treatments, and side effects with which she was personally familiar and that are documented in the record.

As for Nurse Brievald, she treated Hampton's mental impairments. The requirement that medical reports not be based only on subjective complaints applies to mental and physical impairments. With mental issues, however, subjective reports to a treating source often play a more important role in the treatment relationship than they do with physical issues. Hampton's individual and group treatment for depression included "talk therapy" as one component, together with medication. The ALJ should have explained why Brievald's report relied unduly on subjective complaints. This would have included accounting for the fact that the record shows a long history of medication treatment, much of which was administered by Breivald herself. As noted more fully below, the ALJ's

opinion largely passed over Hampton's history of antidepressant use. By failing to note the full extent of Brievald's treatment of Hampton, the ALJ did not adequately address how Breivald's opinion rested "solely" on Hampton's subjective statements. *Ketelboeter*, 550 F.3d at 625. This fails to draw a logical bridge between the record and the ALJ's conclusion.

Citing *Books v. Chater*, *infra*, the Commissioner argues that it is up to an ALJ which medical source to believe. The Court fully agrees. An ALJ is also free to rely on a state-agency physician like Dr. Pilapil under appropriate circumstances. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). However, *Books* also states that this flexibility is subject "to the requirement that the ALJ's decision be supported by substantial evidence." *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996) (internal quote and citation omitted). Substantial evidence does not support the assessment of the nurses' opinions for the reasons just stated.

It is also highly doubtful whether it supports the weight given to Dr. Pilapil's report. The ALJ's only reason for favoring Dr. Pilapil was that he "cited adequate support for his opinion." (R. 40). This fails to reference any of the factors relevant to evaluating medical opinions or to link the assessment with the record. As for Dr. Slodki, the ALJ merely stated that his opinion was "well supported by the evidence." (R. 40). *See Schmidt v. Colvin*, — Fed.Appx. —, 2013 WL 6170872, at *4 (7th Cir. Nov. 26, 2013) (criticizing similar language as "entirely unhelpful" boilerplate). These assessments are based on even less reasoning than that given to the nurse practitioners. In reality, more rigorous guidelines apply to the opinions of non-treating, non-examining sources like Dr. Pilapil than to the reports of

treating sources. An ALJ must apply "stricter standards, based to a greater degree on medical evidence, qualifications, and explanations for the opinions" before giving weight to physician's like Dr. Pilapil. SSR 96-6p.

The Court remands this case based on the reasoning given for the assessment of the nurses' opinions. On remand, however, the ALJ shall explain more fully why he gave considerable weight to Dr. Pilapil and Dr. Slodki. Part of that analysis will also involve the ambiguities contained within Dr. Pilapil's opinion, as described more fully below. Plaintiff's motion is granted on this issue.

## B.    The Credibility Issue

Hampton next claims that the ALJ did not properly assess her credibility. If an ALJ finds that a medical impairment exists that could be expected to produce a claimant's alleged condition, he must then assess how the individual's symptoms affect his ability to work. SSR 96-7p. The fact that a claimant's subjective complaints are not fully substantiated by the record is not a sufficient reason to find that he is not credible. The ALJ must consider the entire record and "build an accurate and logical bridge from the evidence to his conclusion." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). Factors that should be considered include the objective medical evidence, the claimant's daily activities, allegations of pain, any aggravating factors, the types of treatment received, any medications taken, and functional limitations. *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006); *see also* 20 C.F.R. § 404.1529(c)(3); SSR 96-7p. A court reviews an ALJ's credibility decision with deference and overturns it only when the assessment is patently wrong. *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010).

ALJ Asbille never clearly stated what his credibility assessment was in this case. The Court assumes he found Hampton not to be credible. The ALJ's only comment was the usual boilerplate language often found in cases of this type: "The claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 35). The Seventh Circuit has severely criticized such language because it incorrectly implies that a claimant's RFC should be assessed before the ALJ evaluates the credibility of the claimant's statements. *Bjornson*, 671 F.3d at 645. The ALJ would have fallen into that error if he had restricted his analysis to the bare statement that Hampton cites. But he moved beyond this formulaic language and addressed a number of the regulatory factors that govern a credibility analysis, such as the consistency of Hampton's statements, the objective record, and the nature of her treatment.

The relevant issue is whether his analysis of these factors was sufficient to find that Hampton was not fully credible. The Commissioner contends that it was because the ALJ gave due consideration to the objective medical record. The Commissioner points out several examples. Hampton had a normal neurological examination and told her providers in October 2009 and May 2010 that she was doing "okay." Hampton also had improved energy in August 2010 and had a normal range of motion in February 2011. In addition, her depression-related symptoms were noted as improved in May 2009 and June 2010, in part due to the positive effects of Cymbalta.

This argument presents two separate issues that must be distinguished from one another. The first involves the credibility of Hampton's claim that she could not work due

to physical pain. The Court agrees that the ALJ provided sufficient explanation concerning Hampton's alleged back and joint pain. He carefully reviewed the extensive record in this case and correctly noted that she denied significant pain on several occasions. For example, the ALJ reviewed evidence concerning Hampton's range of motion, neuropathic pain, toe ulcer, and hydronephrosis. He also took note of the internal medicine report of Dr. Karri that found Hampton's grip strength and range of motion to be normal.

The second issue revolves around Hampton's emotional state and, in particular, her allegations of fatigue. This involves symptoms related to depression, hepatitis C, and the interferon treatment given to treat that disorder. The ALJ's consideration of these issues presents a far more problematic picture. The ALJ concluded his review of the record by finding that Hampton's treatment was not the type that one would expect from a completely disabled person. He noted, for instance, that Hampton had never been hospitalized for her mental impairment, and that her other treatments had been relatively routine. *See* SSR 96-7p (requiring an ALJ to consider the level or frequency of a claimant's treatment).

The ALJ's reasoning on this issue does not support his credibility decision. The fact that Hampton was never hospitalized for depression is not, in itself, a basis for discounting her credibility. A claimant does not need to be hospitalized in order to show that she suffers from a disabling mental impairment. *See Worzalla v. Barnhart*, 311 F. Supp.2d 782, 796 (E.D. Wis. 2004). Hospitalization is not even required for an episode of decompensation. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(C)(4). Thus, the fact that Hampton was treated by medication and psychotherapy is not an argument for discounting her credibility, at least without further explanation that more carefully links the treatment

with Hampton's allegations.

Hampton's depression treatment may have been "routine," as the ALJ stated, but nothing in the regulations requires a claimant to undergo something more drastic in order to be credible concerning the severity and persistence of her symptoms. What the ALJ overlooked is the scope of the treatment she received. Hampton's treatment for depression was extensive and included medication, individual therapy, and group therapy. The first record concerning Hampton's psychiatric treatment dates from October 2007. Even then, it notes that she had already received prior medication treatment with Cymbalta and Wellbutrin. (R. 332-34). Hampton pursued psychotherapy and medication consultations in one form or another up through the last treatment note in the administrative record dated May 9, 2011. (R. 1038). The long-term nature of these treatments weighs in favor of Hampton's credibility.

A claimant's credibility can be qualified if an ALJ determines that the claimant has been inconsistent in seeking treatment or has not fully complied with a physician's recommendations. SSR 96-7p. The ALJ faulted Hampton on this basis for several reasons. He noted, for instance, that she halted her psychotherapy for approximately six months in 2008. (R. 38). But such non-compliance must be handled with caution when assessing a claimant's credibility. Social Security Ruling 96-7p warns that an ALJ must "not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanation that the individual may provide, or other information in the case record." SSR 96-7p. Here, the ALJ did not make any inquiry on this topic at the hearing. This is

particularly troubling because the ALJ himself noted that Hampton had difficulty in complying with therapy because of her other medical conditions and her responsibilities for her stepson. (R. 38).

The ALJ further discounted Hampton's credibility because she did not always take her antidepressant medication. (R. 39). Again, the ALJ made no attempt to question Hampton on this matter. Before finding that her sometimes spotty compliance weighed against her, the ALJ should have considered whether that could be a function of the mental impairment itself. The Seventh Circuit and other courts have repeatedly stressed that "mental illness . . . may prevent the sufferer from taking [his] prescribed medicines or otherwise submitting to treatment." *Kangail v. Barnhart*, 454 F.3d 627, 630 (7th Cir. 2006). *See also Martinez v. Astrue*, 630 F.3d 693, 697 (7th Cir. 2006) (stating that "people with serious psychiatric problems are often incapable of taking their prescribed medications consistently"); *White v. Comm. of Soc. Sec.*, 572 F.3d 272, 283 (6th Cir. 2009) ("For some mental disorders, the very failure to seek treatment is simply another symptom of the disorder itself."); *Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009).

As with Plaintiff's temporary halt to psychotherapy, this issue was not merely theoretical in this case. Hampton's mental impairment was exacerbated by concerns over her other health problems, which are amply documented in the record. (R. 1038). Several record notes state that she was often highly preoccupied with concerns about her physical health. Indeed, Dr. Hakimi found that her depressive disorder was "secondary to a general medical condition." (R. 497). The combination of depression, diabetes, and hepatitis C and the other limitations that the ALJ found to be severe at Step 2 may have made it

difficult for Plaintiff to be fully complaint with her medication regime. The problem is that the ALJ did not inquire into the issue before discounting her credibility.

The ALJ relied heavily on the fact that Hampton's depression-related symptoms improved with Cymbalta and that she obtained "good relief at times." (R. 39). He also rightly noted that her symptoms fluctuated and required additional psychotherapy in 2010 and 2011. However, it is not clear how the ALJ connected these findings to his credibility assessment. Merely noting symptoms is not the same as explaining how they demonstrate that a claimant's allegations are not fully credible. The ALJ appears to have believed that sporadic improvements showed that Hampton's depression was not as severe as she alleged. He noted, for instance, that she met in November 2010 with Dr. Pfeiffer and was depressed in March 2011. He also properly stated that she was having good days and bad days in May 2011. (R. 39). Numerous treatment notes confirm such changes in her depression symptoms. (R. 562, 1038).

The Court cannot follow the logic that connects these fluctuations with the finding that Hampton was not credible. The fact that Plaintiff's mental condition varied is not necessarily a basis for finding that she was not credible. The Seventh Circuit has explained on many occasions that "a person who suffers from a mental illness will have better days and worse days[.]" *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). *See also Larson*, 615 F.3d at 751; *Phillips v. Astrue*, 413 Fed.Appx. 878, 886 (7th Cir. 2010) ("Many mental illness are characterized by 'good days and bad days,' rapid fluctuations in mood, or recurrent cycles of waxing and waning symptoms."). Social Security Ruling 96-7p also warns ALJs that "[s]ymptoms may vary in their intensity, persistence, and functional

22

effects, or may worsen or improve with time, and this may explain why the individual dos not always allege the same intensity, persistence, or functional effects of his or her symptoms." The ALJ should have addressed this issue in some way before using it against Hampton's credibility.

The ALJ's oversight of this important topic in favor of Cymbalta-related improvements falls short on several fronts. Social Security Ruling 96-7p requires an ALJ to consider a claimant's medication history as part of the credibility analysis. The ALJ in this case failed to note the complex, and somewhat unclear, history of her antidepressant treatment. Hampton only used Cymbalta sporadically. Cymbalta and Wellbutrin were first used prior to the 2007, though the documents for that treatment history are not part of the record. Wellbutrin was prescribed again in 2007 and 2008. (R. 356). Hampton took Cymbalta from late 2008 until around January 2010, when she was placed on setraline (Zoloft). (R. 357). That medication was later found in May 2011 to be ineffective, and Hampton was switched to Paxil.[2] (R. 984). The treatment note states that Plaintiff had been taking setraline "for years without desired response." For reasons that are not clear, another treatment note dated the same day states that Hampton's setraline dosage was increased to 225 mg. daily because she was experiencing ups and downs in her symptoms.[3] (R. 1034).

---

[2] This record may have been error, because it states that Hampton had only been previously treated with Wellbutrin. That was clearly not the case. However, Hampton's name appears on the treatment note. The Court does not address the issue because ALJ has the duty to resolve conflicts in the record. *Young*, 362 F.3d at 1001.

[3] This was beyond Hampton's last date insured. But the fact that Hampton continued to experience something more than the generalized improvement that the ALJ

The ALJ failed to account for almost all of this medication history. In doing so, he did not explain how Cymbalta could be an important factor in the credibility assessment when Hampton's medical providers took her off that medication. This, combined with the ALJ's failure to discuss the significance of her fluctuating symptoms, draws no meaningful connection between Plaintiff's periodic improvements and the credibility assessment. Even if the overall record supports the ALJ's conclusion, he still had a responsibility to consider Plaintiff's condition and medication history with greater care and to make the basis of his conclusion clear.

The same reasoning applies even more forcefully to Hampton's complaints of fatigue. Fatigue is a recognized symptom of chronic hepatitis C. *The Merck Manual* 228 (18th ed. 2006). It is also a common side effect of interferon treatment. *Id*. at 230 ("[Interferon] can produce fatigue, malaise, [and] depression[.]"). The ALJ did not discuss fatigue as it relates to hepatitis C or interferon at all. The Commissioner defends the ALJ's decision, in part, because he concluded that Plaintiff "generally denied symptoms including fatigue and malaise." (R. 36). However, this statement was made to Nurse Judge in January 2008, nearly two years prior to the time that Hampton began using interferon. (R. 484). It explains nothing about the credibility of Hampton's alleged fatigue in subsequent years.

The ALJ's primary consideration of fatigue noted that Hampton occasionally stated that she was feeling more energetic. That was not sufficient, at least standing alone,

---

noted while she was on Cymbalta required a more careful explanation of why her allegations about depression were not credible. *See Halvorsen v. Heckler*, 743 F.2d 1221, 1225 (7th Cir. 1984) (discussing the relevance of post-insured evidence).

because an ALJ is required "to determine whether there are any explanations for any variations in the individual's statements about symptoms and their effects." SSR 96-7p. The ALJ's only approach to this issue was to speculate that Hampton's various statements on fatigue and pain were suspiciously motivated by the disability application itself. He noted that Hampton told a health provider on March 5, 2010 that her attorney wanted the provider to submit a letter assessing her medical condition. (R. 565). Hampton then told the provider that she was fatigued and "swollen." She had stated one month earlier that her aches and pains were "nothing too bad." (R. 37). The ALJ concluded from these inconsistencies that "it is reasonable to presume that her complaints may have been motivated in part by secondary gain issues . . ., and may not have been entirely genuine." (R. 37).

The Court finds this speculation unpersuasive and cannot follow the basis for the reasoning that supports it. The record plainly shows that Hampton's complaints of fatigue did not begin with her request for a disability letter. She told Dr. Karri in January 2010 that she was "very fatigued" because of the interferon. (R. 490). In February 2010, Dr. Pilapil found that Hampton's interferon-related fatigue was "understandable," and therefore presumably credible. (R. 523). Moreover, complaints of fatigue even pre-dated the start of interferon therapy. The psychiatric treatment notes for late 2007 and 2008 are replete with references to fatigue. (R. 347, 349, 350). Hampton was so fatigued in January 2008 that she was discovered asleep in her psychiatrist's waiting area. (R. 345).

If Hampton had been motivated by her disability claim, it would be reasonable to expect her to have complained about fatigue after March 2010 in a consistent manner.

However, she denied fatigue, or claimed increased energy, on several occasions after that date. (R. 897, 911, 918, 935, 947). An ALJ is never required to account for all the evidence in the record. *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985). But by selecting portions of the record that showed improvements in Hampton's energy, the ALJ failed to draw a logical bridge between the record and his finding that she was not credible on this issue.

The medical evidence also suggests that some of this fatigue was related to Hampton's inability to sleep. The psychiatric notes confirm Hampton's claim that she had disturbed sleep, at least on occasion. (R. 344, 345). She also testified on that matter at the hearing. The ALJ did not address this issue or note the medications she took for sleep. If he believed that Plaintiff's testimony concerning sleep was not credible, he was obligated to address the issue and provide an explanation for that conclusion. *See Cuevas v. Barnhart*, 2004 WL 1588277, at *15 (N.D. Ill. July 14, 2004).

The Commissioner argues that the ALJ was correct because he adopted the findings of Dr. Pilapil and Dr. Slodki. Importantly, this argument fails to consider what Dr. Pilapil actually stated in his RFC assessment. Dr. Pilapil found Hampton to be at least partially credible on her fatigue, stating that it was "understandable" that she was tired in light of the interferon therapy given to treat her hepatitis C. (R. 523). This finding runs counter to the ALJ's apparent rejection of Hampton's allegations of being excessively tired. The Commissioner does not explain how the ALJ could rely on Dr. Pilapil's RFC without first explaining how he reconciled the fatigue that Dr. Pilapil credited with his own finding that Hampton exaggerated her symptoms.

The fact that Dr. Pilapil still found that Hampton had the ability to perform sustained work only creates a further ambiguity in the record that the ALJ failed to address. Dr. Pilapil stated: "It would seem reasonable to expect that claimant would respond over time to her therapies, prescribed regimes of exercise and meds *and be capable of performing within the limitations of this RFC assessment by 10/27/10.*" (R. 523) (emphasis added). The problem with this conclusion is that it references a hypothetical state of affairs in the future, not at the time that Dr. Pilapil actually issued his report on February 24, 2010. As a result, the RFC was not based on what Plaintiff could do in spite of her fatigue, so much as it looked forward to a time when her condition would improve to such a point that she would be able to function in the manner that Dr. Pilapil stated.[4] *Cf. The Merck Manual* at 229 (stating that the prognosis for chronic hepatitis "is highly variable"). If the ALJ intended to rely on the RFC to address Hampton's fatigue, he was obligated to discuss the issue in a meaningful way and draw a logical bridge between the physician's and the fatigue issue.

Much of the ALJ's credibility decision was based on his belief that Hampton contradicted herself on several key points. This is not without some merit. The ALJ pointed out that Hampton told various providers that she had stopped working because she had been laid off from her last job. By contrast, she claimed on her disability application that she stopped working in March 2005 because of illness. The Court agrees with the ALJ that this contradiction weighed against Plaintiff's credibility. *See* SSR 96-7p (stating that the consistency of a claimant's statements concerning the persistence and severity of her symptoms are important in determining credibility); *see also Bates*, — F.3d —, 22013

---

[4] As for Dr. Slodki, he did not address fatigue at all in his testimony.

6228317, at *4 (stressing the importance of inconsistencies).

That said, the other inconsistencies that the ALJ identified rest on less secure grounds. The strongest of these involves Hampton's statements about her prior substance abuse. It is undisputed that Hampton had a history of drug and alcohol use but was sober for approximately ten years prior to her mother's death in 2003. She then abused drugs again until she achieved sobriety in September 2007. The ALJ cited several instances in which Hampton was reported to have told health care providers that she had been sober for the past ten years. He concluded that this conflicted with her sobriety date of September 2007 and suggested that she had "often" been less than fully credible concerning other aspects of her disability claim. (R. 40).

The record suggests a more nuanced reality than the ALJ portrayed. The ALJ's first record citation supporting his analysis – a May 2010 medical note – does not state what the ALJ claims. The note does not indicate that Hampton claimed to have been sober for ten years prior to the day the note was entered. It merely states that Hampton was "*previously* clean/sober for 10 years." (R. 869) (emphasis added). Plaintiff was, in fact, "previously" sober for ten years up to her relapse in 2003. (R. 332, 334).

The second citation involves the internal medicine report of Dr. Karri. The physician noted under the heading "Substances" that Hampton had been drinking heavily 20 years earlier. Dr. Karri concluded by noting that Plaintiff "denies any other substance abuse." (R. 490). Like all of the evidence the ALJ cited, this is a second-hand report that does not record what Hampton actually stated. It is unclear in this instance whether Dr. Karri intended to state that Hampton denied any prior substance abuse altogether, or whether

28

she merely told Dr. Karri that she was not currently using drugs.  The latter would have been a true statement.  Plaintiff never denied her history of substance abuse with any other provider.  It is difficult to see what she would have gained by doing so, as her disability claims were not related to substance abuse.  Moreover, she told Dr. Hakimi about it on the same day that she met with Dr. Karri.  Dr. Hakimi wrote that Hampton "has been clean and sober for ten years," without specifying a particular time frame.  (R. 495).

The ALJ also criticized Hampton for her hearing testimony to him concerning her prior drug use.  The relevance of this alleged consistency is even more difficult to understand. The ALJ very briefly asked Hampton if she had ever used "street drugs"; she answered, "Back when I was younger, yeah." (R. 64).  This was a succinct – but entirely truthful – response.  The ALJ did not appear to be troubled by this answer to his inquiry at the hearing, as he asked no follow-up questions despite having the medical history before him.  Moreover, Hampton later stated that she was currently on methadone and had been addicted to Vicodin after she had foot surgery.  (R. 75-76).  If the ALJ believed that Plaintiff's initial response supported a finding that she was being untruthful or evasive, he should have questioned her about it in some manner before using it to discount her credibility.

The ALJ's other purported inconsistencies fare even less well.  He found inconsistent statements about several items related to Hampton's activities of daily living.  Plaintiff testified that her activities were limited by pain and fatigue.  The ALJ noted that the record showed that Hampton cared for her disabled stepson for several years before he was placed in a group home.  Her husband, who suffers from substance abuse and

cirrhosis of the liver, did not help. The ALJ used these facts to discount Hampton's credibility by finding that "she spends most of her leisure time at home taking care of [her adult stepson], apparently without support from her disabled husband." (R. 39). The ALJ further criticized Plaintiff because she admitted that she was her stepson's "primary caregiver." (R. 39).

The ALJ cited two parts of the record to support these findings. The first is a comment on Hampton's initial psychiatric intake form. The psychiatrist noted that "she takes care" of her stepson and that "at time[s] it can be physically and mentally draining." (R. 330). The second is a psychiatric progress note indicating that she "continues to cope with stress of caring for 20 y-o stepson without any support from husband." (R. 353).

Contrary to the ALJ's assumption, these statements say nothing about the amount of time Hampton spent each day caring for her stepson. Nor do they give an indication of what the burdens of that care involved. The fact that Hampton found these tasks draining does not describe what she actually did. Her efforts may have been minimal and still have rendered Plaintiff physically and mentally drained. Hampton told Dr. Hakimi, for example, that she was so tired after getting her stepson ready for school that she found it necessary to spend the rest of the day in bed because there was "no sense to getting up." (R. 495). The fact that Hampton was the "primary caregiver" of her stepson adds little to the equation. The ALJ had no clear idea what these duties involved because Plaintiff did not describe them.

The ALJ further doubted Hampton's daily limitations because consulting physician Dr. Karri noted that "she can do her chores slowly." (R. 490). The ALJ found this to be

inconsistent with Hampton's statement at the hearing that she could not sweep, mop, or vacuum. However, it is entirely unclear what Dr. Karri meant by "doing chores." Hampton testified that she did perform some household duties, including washing dishes while sitting down, bathing, and dressing. She also prepares simple meals. (R. 495). These can reasonably be construed as "chores" that Hampton referred to in her discussion with Dr. Karri. Without inquiring into the matter, the ALJ lacked a reasonable basis for making the broad inference he reached.

The same is true for Hampton's grocery shopping. The ALJ criticized Plaintiff for telling Dr. Karri that she goes shopping with her sister. He contrasted that with a statement she made at the hearing that she had not shopped for food in a long time. Once again, the Court cannot follow why the ALJ found a meaningful inconsistency on this issue. Hampton's hearing testimony was given in June 2011, when she testified that she could not remember the last time she shopped for food. (R. 63). Her statement to Dr. Karri was made in January 2010. Eighteen months had elapsed between the statements the ALJ cited. The fact that Hampton could shop in 2010 but not in 2011 does indicate that she was untruthful when she stated that she could not recall the last time she shopped.[5] That may have been a few weeks, a few months, or the full 18 months since she shopped with her sister. The ALJ should have clarified the evidence on this issue before construing it against Hampton and explained the basis of his reasoning more clearly.

---

[5] The record strongly suggests that Hampton had significant trouble even remembering the dates of significant events in her life. Her attorney had to remind Plaintiff that her diabetes diagnoses was made in 2007 instead of 2009 or 2010, as she initially stated. (R. 60). Her statements on the hepatitis C diagnosis fluctuated from eight months before the hearing date to seven or eight years earlier. (R. 69-70).

Finally, the ALJ concluded that Hampton's allegations about limitations in her social functioning were not as severe as she alleged. In support, he cited a comment under the heading "Social Functioning" in her September 2008 psychiatric assessment update that described Hampton's social functions as "okay.'" (R. 327). The ALJ had no ground for relying on this comment to find that Hampton inconsistently stated that her functioning was not as severe as she alleged. Hampton herself stated in the form:

> I have anxiety, sometimes headaches, anger, don't want to get up and do anything, isolation, not talk to anybody, sometimes I don't really want to bathe, do my hair, brush my teeth. Sometimes I turn on my TV and let me [sic] TV watch me. It puts me in a state of isolation and feeling sorry for myself. I'm feeling physically sick, sometimes my stomach hurts. I cry for no reason. Sometimes I overeat, sometimes I don't eat. It's stemming from what I'm going through, and how I feel about myself.

(R. 323). These comments describe something far more serious than an "okay" level of functioning. Clearly, they provide no support at all for a finding that Hampton believed her functioning was not problematic. The ALJ failed to note in this regard that Dr. Hakimi's report contains a section on Hampton's social history. Hampton told Dr. Hakimi that she sleeps most of the day because she feels "like there 'is no sense to getting up. I can easily see myself corroding.'" (R. 495).

For all these reasons, the ALJ was required to consider the record more thoroughly before concluding that Hampton made inconsistent statements that rendered her other allegations less than credible. Hampton's motion is granted on the credibility issue.

## C.     The RFC Issue

Plaintiff also contends that the ALJ erred in assessing her RFC because he failed to consider her fatigue and various exertional limitations such as her capacity to sit, stand,

walk, and manipulate objects.  The Commissioner argues that the ALJ properly relied on the findings of Dr. Pilapil and the medical expert Dr. Slodki.  Dr. Pilapil found that Hampton could lift and carry up to 20 pounds in a normal workday, and up to ten pounds frequently. She could sit, stand, or walk for up to six hours during the day.  No manipulative impairments were noted.  Dr. Slodki concurred in those findings at the hearing.

An ALJ is entitled to rely on the opinions of state-agency physicians, who are experts in evaluating social security disability claims.  *Flener ex. rel. Flener v. Barnhart*, 361 F.3d 442, 447-48 (7th Cir. 2004).  The Commissioner is correct in noting that Dr. Pilapil assessed Hampton's exertional limitations in a way that is consistent with the ALJ's RFC of light work.  Dr. Slodki stated that he did "not disagree with that RFC."  (R. 81). Ordinarily, the opinions of these medical experts would provide strong support for the limitations the ALJ included in his RFC.

In this case, however, the ALJ failed to address the problem noted earlier – Dr. Pilapil's finding that Hampton was at least partially credible concerning her fatigue.  The issue is critical to the RFC issue because Dr. Pilapil premised his RFC findings on the assumption that Hampton would improve over time – not on her actual ability to carry out sustained work on the date of his evaluation.  The ALJ failed to note this qualification or to address how the subsequent record might have clarified the issue.  This leaves the question of whether or not Hampton could function in the way that Dr. Pilapil imagined unresolved.  The fact that Dr. Slodki adopted Dr Pilapil's RFC does not solve the dilemma. Dr. Slodki never mentioned fatigue or expressed a medical opinion on whether Hampton's energy level had improved from the time that Dr. Pilapil issued his RFC in February 2010.

This left the ALJ to address the issue on his own.  Social Security Ruling 96-8p

requires the RFC assessment to "include a narrative discussion describing how the evidence supports each conclusion." It further states:

> In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

The ALJ did not comply with this requirement. Dr. Pilapil believed that Hampton would respond in the future to her "therapies, prescribed regimes of exercise and meds." (R. 523). The ALJ did not address in any manner how these factors led to the improvements that Dr. Pilapil thought could take place. This leaves unresolved, and undiscussed, how Hampton could sustain work activities on a regular basis, as SSR 96-8p requires. Such an omission is "in itself sufficient to warrant reversal." *Briscoe ex. rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). As a result, the ALJ drew no link between the record and the improvements that Dr. Pilapil believed could take place for Hampton's fatigue caused by interferon.

The ALJ may have believed that Dr. Pilapil's qualifying language concerning fatigue was not serious enough to find that Hampton could not work on a sustained basis. But he did not address the issue or explain what evidence supported setting those concerns aside. Dr. Pilapil's comments create an ambiguity concerning Hampton's ability to perform full-time work that the ALJ was required to resolve. SSR 96-8p (requiring an ALJ to resolve all ambiguities before assessing a claimant's RFC). To do so, he first had to note the problem raised by the RFC report. As it stands, the ALJ provided no explanation of how

he reached the conclusion that Hampton could work on a sustained basis for five days a week.

This oversight, combined with the ALJ's flawed credibility analysis and failure to explain the reasons for giving little weight to the nurse practitioners, requires him to address Hampton's RFC more carefully on remand. Plaintiff's motion is granted on the RFC issue.

## IV.  Conclusion

For the reasons stated above, Plaintiff's motion for summary judgment [19] is granted, and the Commissioner's motion [22] is denied. This case is remanded to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

**ENTERED:**

**_____**
**DANIEL G. MARTIN**
**United States Magistrate Judge**

Dated: December 13, 2013